UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF: ) | |
| ) | |
| AMERICAN CONSOLIDATED ) | CASE NO. 09 B 26062 |
| TRANSPORTATION COMPANIES, et al., ) | (Jointly Administered) |
| ) | |
| Debtor ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH HEARING ON USE OF CASH COLLATERAL TO PAY PROFESSIONAL FEES AND RETAINER

Following evidentiary hearing on motion of Debtors to use cash collateral pursuant to § 363 of the Bankruptcy Code (11 U.S.C. §§ 101, et seq., the "Bankruptcy Code") and also to allow and pay professional fees and a retainer (Dkt. Nos. 422 and 446), the following Findings of Fact and Conclusions of Law are made and will be entered.

### FINDINGS OF FACT

1. On July 18, 2009, the Debtors filed for protection under Chapter 11 of the Bankruptcy Code. Since then, the Debtors have been operating their businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. No trustee, examiner or creditors' committee has been appointed.

2. Each of the Debtors is engaged in some fashion in the bus and transportation industry:

   A. American Consolidated Transportation Companies, Inc. ("ACTC") is a holding company owned by Karen Bingham, members of her family and family trusts. ACTC provides centralized administrative services for the Debtors. Other than providing centralized administrative services for the Debtors, ACTC does not engage in business with third parties and does not have separate revenue from transactions with third parties.

B. D&B Rental, LLC is a limited liability company owned by Karen Bingham, members of her family and family trusts. Its property consists of (i) the land and buildings located at 2513 E. Higgins Road, Elk Grove Village, Illinois, (ii) the land and buildings located in Commerce City, Colorado (owned jointly with Colorado Charter Lines, Inc.), and (iii) the land and buildings located in Harvard, Illinois (the "Harvard Property"). The Debtors operate certain of their businesses from the Elk Grove Village, Illinois and Commerce City, Colorado locations.

C. Davidsmeyer Bus Service, Inc. is a school bus company located in Elk Grove Village, Illinois. Davidsmeyer Bus Service's business consists of contracting with school districts to provide school bus service.

D. Mid-America Tours, Inc. is a tour bus company located at the Elk Grove Village address. Mid-America Tours' business consists of sponsoring and running bus tours throughout the country.

E. Mid-America Charter Lines, Inc. is charter bus company located at the Elk Grove Village address. Mid-America Charter's business consists mainly of owning and operating charter buses. It also owns the stock of Colorado Charter and certain accounts receivable.

F. Mid-America Travel, Inc. is located at the Elk Grove Village address. It does not own any assets other than a membership in the Airline Reporting Corporation and certain cash and receivables.

G. Central States Coach Parts, Inc. is a bus repair parts company headquartered at the Elk Grove Village address. Central States Coach Parts' business consists of buying and selling bus parts to the other Debtors. Its assets consist of an

inventory of parts located in Elk Grove Village, Illinois, Commerce City, Colorado, and a location in Texas operated by a non-debtor affiliate, Southwest Prevost, Inc.

H. Central States Coach Repairs is a bus service company located at the Elk Grove Village address. Central States Coach Repairs' business consists of servicing buses owned by the other Debtors. Its assets consist of certain accounts receivable and certain machinery and equipment used to service buses.

I. Colorado Charter Lines, Inc. is a charter bus company located in Commerce City, Colorado. Its business consists of providing bus charters in the Denver, Colorado area. Its assets consist of certain buses, machinery, equipment, and accounts receivable. It also owns the land and buildings located in Commerce City, Colorado (jointly with D&B Rental, LLC).

J. Central West Motor Stages, Inc. is a charter bus company that operates in Grand Prairie, Texas. Its business consists of providing bus charters. Its assets consist of certain accounts receivable, machinery, and equipment.

3. RBS Citizens d/b/a Charter One (the "Bank") filed proof of claims against each of the Debtors (who are all jointly and severally liable to it) on September 3, 2009 in the total amount of $6,003,538.21, which are comprised of the following components:

a. $549,317.54 relates to amounts allegedly owing pursuant to a swap agreement.

b. An additional $3,892,512.88 relates to amounts owing under a real estate loan. Under the terms of the real estate loan, interest continues at the rate of $16,960.84 per month using the non-default rate and $33,941.89 per month using the default rate.

c. An additional $38,437.90 relates to amounts owing under a forbearance agreement.

  d. An additional $986,883.28 relates to amounts owing under a line of credit loan. Under the terms of the line of credit loan, interest continues at the rate of $2,538.43 per month using the non-default rate and $5,080.25 per month using the default rate.

  e. An additional $541,386.61 relates to amounts owing under an equipment loan. Under the terms of the equipment loan, interest continues at the rate of $2,362.59 per month using the non-default rate and $4,728.33 per month using the default rate.

  f. Since the Petition Date, interest and legal fees and expenses have allegedly continued to accrue under the D&B Term Note, the ACTC Term Note, and the ACTC Revolver. As of June 1, 2010, the Bank claims that Debtors owed the Bank the following additional amounts totaling $1 million:

   (1) $85,516.46 in interest at the contract rate;

   (2) $233,719.07 in interest at the default rate;

   (3) $202,163.19 in PIK interest under the First Amendment to Forbearance Agreement;

   (4) $9,900.00 in appraisal and environmental assessment fees;

   (5) $30,000.00 in a forbearance fee;

   (6) $7,724.26 in late charges; and

   (7) $554,756.31 in legal fees.

  g. The total of the Bank's claims is now about $7 million secured by the Debtor's several pieces of real estate and rolling stock.

4. In accordance with prior agreement of the parties entered on the record herein on September 3, 2009, the Bank also holds a second lien position against the Harvard Property to secure $500,000 of the amount owed the Bank. This lien was granted to the Bank as additional adequate protection.

5. On October 28, 2009, a Memorandum Opinion was issued on Debtors' Motion for Preliminary Use of Cash Collateral (the "10/28/09 Opinion") (Dkt. No. 173) finding that Debtors' assets on which the Bank then held pre-petition liens (including real estate, busses and parts inventory) were worth $9,219,792.58 at fair market value and $6,352,792.58 at liquidation value.

6. The assets included in that valuation did not then include the cash the Debtors now have on hand or the Harvard Property.

7. As of August 20, 2010, the Debtors held approximately $1.5 million in cash, which was benefitted by $793,157 in proceeds from a life insurance policy arising from the death of a key officer. The Bank did not have a security interest in those insurance proceeds which were commingled with other business cash and used in operation of the Debtors and generation of new account receivables. Debtors do not presently contend that any parts of receivables generated by the use thereof are free from the creditor's liens.

8. The value of the Harvard Property was not proven, and it is subject to a $400,000 mortgage, so the net value of the junior lien owed by the Bank cannot be ascertained in this Opinion.

9. There is no contest of the Bank's assertion that all property of Debtors secures the debts due to it. The total collateral securing the Bank's claim has now risen to a fair market value of $10.7 million, which includes the Bank's pre-petition collateral and $1.5 million in cash, but not the Harvard Property.

10. The Debtors filed an objection to the Bank's claim. That objection has not been resolved. The Bank is thus not the holder of an allowed secured claim for purposes of voting on the Plan though it can seek valuation of its claim for that purpose. See 11 U.S.C. §§ 502, 1126(a); Fed. R. Bankr. P. 3018(a). However, for purposes of providing adequate protection for

use of cash collateral, that objection does not eliminate need for providing protection to the secured claim even though that claim is subject to an objection. See 11 U.S.C. § 363(e)(requiring adequate protection of creditor's interest).

11. On July 27, 2010, an agreed cash collateral order was entered authorizing Debtors to use cash collateral through December 3, 2010 (the "July 27 CCO").

12. The budget appended to the July 27 CCO did not include a line item to pay professional fees because the Bank refused to consent to such payment. The Debtors submitted a proposed modified budget to the Bank that included $500,000 for professional fees. The Bank refused to consent to the modified budget, making necessary the instant motion to use cash collateral before the Debtors' professionals can be paid.

13. The pending fee applications as to which use of cash collateral is requested seek the following:

|  | Fees Now Sought and Expenses |  | Prior Applications |
|---|---|---|---|
| Richard W. Martinez | $121,678.75 | $ 314.51 | $ 77,875.50 |
| Eva M. Hotard (Business Support Service, LLC) | $168,105.00 | $ 9,380.63 | $132,090.62 |
| William J. Factor, Ltd. | $145,380.00 | $ 538.56 | $ 76,606.49 |
| TOTALS | $435,163.75 | $10,233.70 | $286,572.61 |

In addition, the Factor firm is withdrawing as Debtor's counsel, and a replacement firm seeks a $75,000 retainer, bringing the total sought to over $520,000.

14. Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## **CONCLUSIONS OF LAW**

A.  <u>The Bank Is Not Entitled to Adequate Protection</u>

Section 363(c)(2) of the Code provides that debtors must obtain consent or court authorization prior to use of cash collateral. Section 363(e) provides that the courts should prohibit or condition such use of cash collateral as is necessary to provide adequate protection of a pre-petition secured lender's interest.

The purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy." <u>In re O'Connor</u>, 808 F.2d 1393, 1396 (10th Cir. 1987). If a creditor's interest in the debtor's property is not declining in value, the creditor is not entitled to adequate protection. <u>United Sav. Ass'n. v. Timbers of Inwood Forest Assocs.</u>, 484 U.S. 365, 371 (1988) ("[T]he 'interest in property' referred to by § 362(d)(1) includes the right of a secured creditor to have the security applied in payment of the debt upon completion of the bankruptcy reorganization; and that that interest is not adequately protected if the security is depreciating during the term of the stay."); <u>Fed. Nat'l Mortg. Ass'n v. Dacon Bolingbrook Assocs. Ltd. P'ship</u>, 153 B.R. 204, 209 (N.D. Ill. 1993) ("[T]he Debtor must provide adequate protection only to the extent the value of [a creditor's] collateral is declining.").

The burden was on the Bank to demonstrate that its collateral is declining in value as a result of the automatic stay before it would be entitled to adequate protection. <u>In re Gunnison Ctr. Apts., LP</u>, 320 B.R. 391, 396 (Bankr. D. Colo. 2005). It has not proved that. Indeed, the fair market value of the Bank's security has increased from $9,220,000 to $10,700,000, an increase of $1,480,000 due partly to progress of the business and partly from receiving almost $800,000 from key-employee insurance that was used to generate new receivables and collections.

Nor has the Bank met its burden of proving that the value of its collateral will decline during the pendency of the Debtors' bankruptcy cases. It argues that Debtors face future cash flow problems because their most lucrative contract terminated in September of this year. However, testimony by its current manager indicated an active program to expand the marketing of its assets and services into new areas to make up for loss of that contract. Some success has been achieved in that effort. Moreover, the large amount of cash held, if carefully used, can support needs of the Debtors as they build new business.

As a result, the Bank is not entitled to any form of adequate protection. See Dacon, 153 B.R. at 209 (no adequate protection needed because collateral was not declining in value); In re Constable Plaza Assocs., 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) ("[D]ebtor's plowing back rents solely for the purpose of maintaining and operating its office building will serve to preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage.")

B.  Alternatively, the Bank is Adequately Protected by a Substantial Equity Cushion

Even if the Bank were entitled to adequate protection, it is adequately protected by a substantial equity cushion in the Debtors' property, including specifically the Debtors' real estate, buses, inventory, and cash. See In re Aaura, Inc., 2006 Bankr. LEXIS 2011 (Bankr. N.D. Ill. Sept. 1, 2006) ("An equity cushion may indeed provide adequate protection.") (citing In re James Wilson Assoc., 965 F.2d 160, 171 (7th Cir. 1992); In re Markos Gurnee P'ship, 252 B.R. 712, 716-17 (Bankr. N.D. Ill. 1997)).

Under the Bankruptcy Code, a creditor's collateral is valued "in light of the purpose of the valuation and of the proposed disposition or use of such property." 11 U.S.C. § 506(a). The

Debtors' property is valued for purposes of allowing the Debtors to "use such property" to operate their businesses. By its very nature, this presupposes a going concern or fair market valuation. See Assocs. Commercial Corp. v. Rash, 520 U.S. 953, 962 (1997) ("As we comprehend § 506(a), the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question."); United Air Lines, Inc. v. Reg'l Airports Improvement Corp., 564 F.3d 873, 875 (7th Cir. 2009) ("An asset's value depends on the price that could be agreed by willing buyers and sellers negotiating for a replacement."); In re Winthrop Old Farm Nurseries, Inc., 50 F.3d 72, 74 (1st Cir. 1995) ("A number of courts, however, including four Circuit Courts, have adhered to this clear expression of congressional intent and declined to value collateral that a debtor proposes to retain based on a hypothetical foreclosure sale.") In re Pelham Enters., 376 B.R. 684, 693 (Bankr. N.D. Ill 2007) (concluding that "a liquidation value inappropriate here" because equipment was being put to use")

The Debtors are going concerns and their recent and current improvement in profitability of operations supports their ability to continue in operations over the foreseeable future. While the Bank's Chapter 11 Plan proposes to liquidate Debtors' assets, that Plan is contested and the business has thus far shown a basis for a possible reorganization rather than liquidation.

The earlier opinion approving use of cash collateral concluded that the Debtor's property should be valued using a fair market yardstick (see 10/28/09 Memorandum Opinion) and the evidence at the recent hearing on Debtors' instant motion supports continued use of that yardstick. The Debtors have proposed a reorganization plan contemplating that the Debtors will continue in operation.

It is determined here that the combined fair market value of the Bank's pre-petition collateral and cash is approximately $10.7 million, which substantially exceeds the $6 million

claim filed by the Bank even when supported by another $1 million in post-petition accruals, and thereby provides the Bank with an equity cushion in excess of 50% of its total claims. Thus, the Bank is adequately protected. See e.g., In re Mendoza, 111 F.3d 1264, 1272 (5th Cir. 1997) ("Case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection.");

C. Payment of Professional Fees is often Appropriate in Chapter 11 Where Use of Cash Collateral is Allowed

Section 331 of the Bankruptcy Code provides that professionals may seek periodic awards of interim compensation. Award of interim fees is discretionary. In re Spanier Bros., 191 B.R. 738, 747 (Bankr. N.D. Ill. 1996). When the financial position of the estate is uncertain, an award of all fees sought may not be appropriate. In re Alberto, 121 B.R. 531, 538 (Bankr. N.D. Ill. 1990).

Section 331 of the Bankruptcy Code evinces intent of Congress that professionals not be compelled to finance a bankruptcy case and that qualified professionals be attracted to render bankruptcy services. In re Knudsen Corp., 84 B.R. 668, 672 (B.A.P. 9th Cir. 1988) ("Moreover, the Trustee ignores the problem, arising especially in large cases, that when counsel must wait an extended period for payment, counsel is essentially compelled to finance the reorganization. This result is improper and may discourage qualified practitioners from participating in bankruptcy cases, a result that is clearly contrary to Congressional intent.").

Section 331 recognizes that a bankruptcy case should not be run on the backs of professionals. See, e.g., In re UNR Indus., Inc., 30 B.R. 613, 617 (Bankr. N.D. Ill. 1983) ("[T]he purpose of the interim compensation provision is only to relieve attorneys from the economic burden of participating in lengthy and complex bankruptcy proceedings.").

The amounts of fees sought are not objected to by the Bank or any party in interest. However, those amounts total over $520,000 which looms large at this phase of the case. The new counsel who seeks a $75,000 retainer included in that total will surely be seeking more payments for future work.

While the amounts of payments sought by professionals on top of their prior awards have not been objected to and the Debtors hold sufficient cash, discretion compels holding back part of the fees for two reasons: First, to help maintain a good cash flow in the business so as to continue the successful pace of its recovery and protect cash flow against the effect of losing a major contract; and second, to recognize that full value of the past services of these applicants will not be clear until the Debtors confirm a plan and emerge from bankruptcy. Therefore, 25% of the fees allowed for each will be held back until Plan confirmation, except that the retainer sought by new counsel will be paid in full.

## CONCLUSION

Therefore, cash collateral will be allowed to be used to pay fees, and the fees sought have been allowed fully by separate orders, but 25% of the fees for each will be held back except for the retainer to be paid to new counsel. Separate orders in accord with the foregoing have been entered.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 10th day of September, 2010.