UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **In re:** ) | |
| ) | No. 09 B 26062 |
| American Consolidated Transportation ) | |
| Companies, Inc., et al., ) | Chapter 11 |
| ) | |
| Debtors. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING HEARING ON DEBTORS' PLAN OF REORGANIZATION

This matter relates to a Chapter 11 case filed by nine related entities[1] ("Debtors"). Those cases were administratively consolidated under the above captioned case number. Debtors now seek confirmation of their Amended Plan of Reorganization ("Plan"). Debtors must overcome several objections made by RBS Citizens, N.A. d/b/a Charter One ("Charter One"), their secured creditor. Following an evidentiary hearing on confirmation of Debtors' Plan and those objections, the following Findings of Fact and Conclusions of Law are made and entered pursuant to which the Plan is approved subject to further evidence relating to the interest rate that Debtors must pay and ruling thereon.

### Background

Debtors consist of a holding company and eight transportation and related companies with locations in Texas, Colorado, and Illinois. The business was founded in 1947 to provide transportation to and from school for the founder's daughter, Karen Bingham ("Bingham"). Bingham resides on one of the Debtors' properties and serves as the Debtors' Chief Executive Officer. In 1950, the business was expanded to include charter bus services.

Debtors' businesses currently provide charter bus services for schools, tour groups, and commercial building occupants. Some Debtor entities provide bus maintenance and parts services. Debtors also own several parcels of real estate in Illinois, Colorado, and Texas. Debtors lease space on one of their properties in Illinois for other transportation companies to park their vehicles.

---

[1] The entities are: American Consolidated Transportation Companies, Inc.; Davidsmeyer Bus Service, Inc.; Mid-America Charter Lines, Inc.; Central States Coach Parts, Inc.; Mid-America Tours, Inc.; Central States Coach Repairs, Inc.; Mid-America Travel, Inc.; Colorado Charter Lines, Inc.; Central West Motor Stages, Inc.; and D&B Rental, LLC.

1

## JURISDICTION

Jurisdiction lies under 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

## FINDINGS OF FACT

1. Debtors continue to operate as debtors-in-possession under §§ 1107 and 1108 of the Bankruptcy Code. No committee of creditors or trustee has been appointed.
2. Karen Bingham ("Bingham") is the majority shareholder and chief executive officer of Debtors. She has been the majority shareholder and sole chief executive officer since the death of her husband, Richard Bingham in 2010.
3. In July 2010 Debtors lost the school bus route services contract with Township District 214, but continue to provide charter services to other customers.
4. As of March 28, 2011, Debtors jointly and severally owed to Charter One the sum of $7.1 million (the "Allowed Secured Claim") under terms of their loan arrangements with that creditor. (Stip. ¶ 3)
5. The Allowed Secured Claim reflects the agreement between Debtors and Charter One as to amounts due under the following promissory notes and other contracts:
    a. A Term Note dated September 27, 2006 executed by D&B Rental, LLC and delivered to Charter One in the original principal amount of $4,000,000.00 (Stip. ¶ 4(a));
    b. A Term Note dated October 12, 2006 executed by American Consolidated Transportation Companies, Inc. and delivered to Charter One in the original principal amount of $1,000,000.00 (Stip. ¶ 4(b));
    c. A Revolving Demand Note dated October 12, 2006 executed by American Consolidated Transportation Companies, Inc. and delivered to Charter One in the principal amount of $1,000,000.00 (Stip. ¶ 4(c); Charter One Ex. 16); and
    d. An Interest Rate Swap Confirmation dated October 2, 2006. (Stip. ¶ 4(d))
6. In accordance with the terms of the loan arrangements, Charter One recorded UCC financing statements that resulted in Charter One obtaining a first, perfected security

interest in Debtors' accounts, inventory, other personal property, and the proceeds thereof. (Stip. ¶ 9)

7. Charter One also obtained a first, perfected security interest against certain school buses and motor coaches owned by Debtors. (Stip. ¶ 10)

8. Charter One and Debtors agreed that interest would continue to accrue on the Allowed Secured Claim, but reserved their rights with regard to the rate at which interest would accrue.

9. Between March 28, 2011 and November 18, 2011, Debtors have made five adequate protection payments to Charter One, each in the amount of $39,938.00, which have been applied to the Allowed Secured Claim. (Stip. ¶ 11)

10. Debtors are current in the payment of post-petition withholding taxes. (Debtors' Proposed Findings ¶ 19; Tr. 190)

11. Pursuant to an order dated June 6, 2011, Debtors sold forty-six school buses, the proceeds of which, in the amount of $363,000.00 were remitted to Charter One and have been applied to the Allowed Secured Claim. (Stip. ¶ 12)

12. Pursuant to an order dated August 29, 2011, Debtors sold two additional buses, the proceeds of which, in the amount of $5,600.00, were remitted to Charter One and have been applied to the Allowed Secured Claim. (Stip. ¶ 13)

13. For purposes of the confirmation hearing, the parties stipulated that the buses and motor coaches in which Charter One has a first, perfected security interest have a fair market value of $1,449,800.00. (Stip. ¶ 15)

14. For purposes of the confirmation hearing, the parties further stipulated that the Elk Grove Village, Illinois property has a fair market value of $3,750,000.00. (Stip. ¶ 16)

15. For purposes of the confirmation hearing, the parties also stipulated that the property located in Commerce City, Colorado has a fair market value of $875,000.00. (Stip. ¶ 17)

16. Finally, for purposes of the confirmation hearing, the parties also agreed that the property in Grand Prairie, Texas has a fair market value of $500,000.00. (Stip. ¶ 19)

17. As of November 18, 2011, Debtors had cash in the amount of $280,435.00; accounts receivable in the amount of $406,229.00; and parts inventory with a value of $412,4231.00. The total value of these assets is $1,108, 987.00. (Stip. ¶ 20)

18. Altogether, the total fair market value of assets that secure Charter One's debt is $8,187,887.00 and is more than $1 million greater than the amount of Charter One's Claim, making Charter One an over-secured creditor. (Stip. ¶¶ 21, 22)

19. Bingham resides on Debtors' Elk Grove Village, Illinois property. (Debtors' Proposed Findings ¶ 7)

20. D&B Rentals, LLC, entered into a contract to sell the farm located in Harvard, Illinois for the sum of $1.4 million. The sale of the farm was approved by order and was scheduled to close on or before March 1, 2012. (Debtors' Proposed Findings ¶ 3, Debtors' Ex. 40) The parties have not since reported on the closing. For purposes of these Findings it is assumed that the sale closed because no problem with closing has been reported.

21. The farm secures a debt to Charter One in the amount of $500,000 and First Farm Credit in the amount of approximately $375,000. (Debtors' Proposed Findings ¶ 2)

22. Proceeds from sale of that farm will be used to reduce Charter One's debt by $500,000 and complete payoff of debt owed to First Farm Credit in the approximate amount of $375,000. (*Id.* at ¶ 4; Tr. 280)

**Charter One's Treatment Under the Plan**

23. The Plan provides that the debt to Charter One will be paid through monthly payments of principal and interest over two and one-half years (thirty months) according to a thirty-year amortization schedule at an interest rate of 6.75%.

24. Under the Plan, Charter One will retain its liens and security interests against the same assets that it had prior to Confirmation.

25. Debtors plan that payment of the remainder of Charter One's secured claim will be achieved through re-financing. (Plan ¶ 4.4.1.2) As stated in Debtors' Disclosure Statement, "[a]t the expiration of two and one-half years estimated to be April 2014, a balloon payment will be due [to Charter One], and in the event the Debtors have not secured refinancing of the Bank Debt or have a letter of intent for such refinancing, the Debtors will agree to a liquidation of their assets by the Bank either in or out of Bankruptcy Court." (Plan ¶ 4.4.1.2)

4

**Debtors Projections and Business Prospects**

26. Debtors have earned about the same amount of gross revenue from charter business and other operations in the year 2011 that they earned in 2010, largely due to the sales and reorganization efforts of the Debtors' new chief operating officer, Charles T. Bellows III, despite facing challenging business problems (Tr. 228)

27. Debtor Mid-America Charter Lines signed a post-bankruptcy shuttle bus contract with 600 West, LLC. (Tr. 55; Debtors' Ex. 3) That contract yields about $90,000 per month of gross revenue for Debtors. (Tr. 24)

28. Debtors have implemented cost cutting measures, including eliminating certain high-salaried positions and by combining other jobs. (Tr. 258) Debtors have also eliminated expenses totaling approximately $160,000 in reduction of real estate taxes and salaries eliminated in excess of $130,000 annually. (Tr. 484, 485)

29. Debtors' new business model includes leasing space to other transportation companies and securing shuttle bus contracts with downtown Chicago office buildings. (*See* Tr. 503)

30. Debtors' Plan provides for distribution to Debtors' creditors out of operations, with assistance to be provided by a non-debtor, Ameritrans, which now has approximately $62,000 ready for Debtors' discretionary use and without obligation of repayment until all other creditors of Debtors are paid in full.

31. Debtors' projections assume a five percent increase in sales and three percent price increase. (Debtors' Proposed Findings ¶ 26; Tr. 246, 250) These projections show that Debtors will have sufficient cash to meet current expenditures as they are incurred as well as Plan payments to creditors. (Debtors' Ex. 17(b)) The Plan provides for monthly payments to Charter One totaling $46,000 and payment in full to pre-petition unsecured creditors over a four year period. The Plan further provides that if payments are not made to Charter One, then the Debtors assets may be sold to satisfy its Claim. (Debtors Second Supplement Amending Eighth Plan of Reorganization. Dkt. 977, ¶ 1(G)) (hereinafter "Second Supplement") It also provides for payment in full of the balance of debt due to Charter One two and one-half years after the effective date of the Plan from refinancing. (Plan ¶ 4.4.1.2) If Debtors cannot

obtain refinancing by that date then Debtors' assets may be sold to satisfy Charter Ones Claim. (Second Supplement ¶ 1(G))

32. Additional facts set forth in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

Chapter 11 debtors must show by a preponderance of the evidence that every requirement for plan confirmation set forth in 11 U.S.C. § 1129 have been met. *U.S. ex rel. Farmers Home Admin. v. Arnold & Baker Farms (In re Arnold & Baker Farms)*, 177 B.R. 648, 654 (B.A.P. 9th Cir. 1994) (citing *In re Rusty Jones, Inc.*, 110 B.R. 362, 373 (Bankr. N.D. Ill. 1990)). Filing an objection does not shift the burden away from the plan proponent that all requirements have been met. *In re Rusty Jones, Inc.*, 110 B.R. at 373. Charter One argues that several requirements for confirmation under 11 U.S.C. § 1129 are lacking in this case.

**Debtors' Plan is Fair and Equitable**

First, Charter One has not accepted the Plan as indicated by its objection to confirmation. Section 1129(a)(8) provides that "[w]ith respect to each class of claims . . . (A) such class has accepted the plan; or (B) such class is not impaired by the plan." As Debtors' Plan does not leave unaltered Charter One's legal, equitable, and contractual rights, Charter One is impaired under the Code. 11 U.S.C. § 1124. However, if the Plan satisfies all requirements in 11 U.S.C. § 1129(a) but § 1129(a)(8), the Debtors may seek confirmation notwithstanding Charter One's objection by using the "cram down" provisions in 11 U.S.C. § 1129(b). *In re TCI 2 Holdings LLC*, 428 B.R. 117, 156–57 (Bankr. D.N.J. 2010).

Section 1129(b)(1) requires that the plan "must not discriminate unfairly, and [must be] fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted the plan." Charter One argues that Debtors Plan is not fair and equitable with respect to it because the Plan does not include an appropriate interest rate.

Section 1129(b)(2)(A) contains three non-exclusive means to ensure a plan is fair and equitable with respect to dissenting secured creditor classes. Charter One argues in its post-trial Proposed Findings of Fact and Conclusions of Law that Debtors Plan does not comply with § 1129(b)(2)(A)(i), which requires that a plan provide:

> (I) that the holders of [secured] claims retain the liens securing such claims . . . ; and

6

> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.

If a creditor is to receive payments over time, the present value of the claims to be paid must include the amount of its allowed claim, plus an appropriate rate of interest to compensate the creditor for risk as to those deferred payments. *Rake v. Wade*, 508 U.S. 464, 472 (1993); *United Sav. Ass'n v. Timbers of Inwood Forest, Assocs., Ltd.*, 484 U.S. 365, 377 (1988); *see also Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns)*, 547 F.3d 763, 768–69 (7th Cir. 2008). Charter One will retain the lien securing its claims but argues that it will not be paid the value of its claim as required by the statute because Debtors' proposed interest rate is too low to compensate for the risk of non-payment.

Charter One contends that the appropriate rate in this case would be the pre-petition contract default rate of LIBOR (London Interbank Offered Rate) plus 10% per year. (Charter One's Proposed Conclusions ¶ 156) Debtors Plan provides for a 6.75% rate of interest (using the current prime plus 3%). Charter One cites extensively in support of its argument *Till v. SCS Credit Corp.*, an Opinion from the Supreme Court on the appropriate interest rate for plans in Chapter 13 cram down situations. 541 U.S. 465 (2004). In its post-trial Proposed Conclusions of Law, Charter One details its analysis on an appropriate risk factor given Debtors' history. It also complains that Debtors did not introduce any evidence in support of the rate chosen by them. However, Charter One is mistaken about which party carries the burden on interest rate determination in the plan confirmation process. While generally the debtor bears the burden on confirmation issues, the plurality Opinion in *Till* indicated that the burden is on the creditor to present the appropriate risk premium. *Till*, 541 U.S. at 484–85. Charter One has not submitted authority indicating that a different approach is appropriate for a Chapter 11 plan confirmation. Therefore, determination of an appropriate interest rate is reserved pending need for Charter One to prove by evidence that its calculation of interest is correct.

Charter One also contends that Debtors' Plan violates further requirements under 11 U.S.C. § 1129(b)(2)(A). It argues that a plan under this provision to be fair and equitable must not unreasonably shift the risk of a debtor's failure to a creditor even if other explicit conditions in the Code are satisfied. Indeed, it has been held that technical compliance with requirements listed in § 1129(b)(2) does not necessarily mean that a plan in Chapter 11 meets the "fair and

equitable" standard. *In re D&F Construction, Inc.*, 865 F.2d 673, 675 (5th Cir. 1989). Section 1129(b)(2) states that "the condition that a plan be fair and equitable with respect to a class *includes* the following requirements. . . ." 11 U.S.C. § 1129(b)(2) (emphasis added). Section 102(3) of the Bankruptcy Code makes clear that the word "includes" is not limiting. 11 U.S.C. § 102(3).

However, in arguing that Debtor's Plan is not fair or equitable, Charter One relies on *D&F Construction*, a case rejecting a plan that proposed treatment far riskier to the creditor in that case than applies to the proposed treatment of Charter One's Claim. In that case, a Fifth Circuit Opinion vacated an order confirming the debtor's plan because that plan barred the secured lender's exercise of its foreclosure rights, required negative amortization for twelve years, and effectively deferred payment of principal for fifteen years. *Id.* at 675–66.

In contrast, here Charter One will be paid interest and principal on a monthly basis for two and one-half years according to a thirty-year amortization schedule. (Second Supplement ¶ 1) At the expiration of that period, the Plan requires Debtors to pay in full the balance of Charter One's claim through refinancing. (*Id.*) In the event of default on any Plan payment to Charter One or if the balloon payment is not made, Charter One will be entitled to liquidate Debtors' assets. (*Id.* at ¶ 1(G)) Charter One's risk is limited to the possibility of a decline during that period in the value of Debtors' assets. Charter One admits it is oversecured today by more than $1 million in value of collateral over debt so that risk does not appear great. At any event, following further hearing the risk will be covered by an appropriate interest rate.

**Debtors' Plan Meets the Feasibility Standard**

Charter One argues Debtors' Plan does not satisfy the feasibility standard found in 11 U.S.C. § 1129(a)(11). Under that provision, a plan proponent must establish that confirmation of its plan "is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor" unless liquidation or further reorganization is proposed in the plan.

In determining whether a plan is feasible, the bankruptcy judge need not find that it is guaranteed to succeed. Rather, "[o]nly a reasonable assurance of commercial viability is required." *Matter of 203 N. LaSalle St. P'ship*, 126 F.3d 955, 961–62 (7th Cir. 1997) (Rev'd on other grounds). In assessing viability, a bankruptcy judge must undertake a complex evaluation of available data concerning the past, present, and proposed future operations of the debtor. *In re Potter Material Serv., Inc.*, 781 F.2d 99, 104 (7th Cir. 1986) "The feasibility requirement

mandates that the plan proponent offer concrete evidence of sufficient cash flow to fund and maintain both its operations and its obligations under the plan." *Coones v. Mut. Life Ins. Co. of N.Y.*, 168 B.R. 247, 255 (D.Wyo.1994), *aff'd*, 56 F.3d 77 (10th Cir.1995).

In analyzing feasibility, the bankruptcy judge "views the probability of actual performance of the provisions of the plan. Sincerity, honesty, and willingness are not sufficient to make the plan feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *Matter of Bergman*, 585 F.2d 1171, 1179 (2d Cir. 1978).

Factors considered pertinent in this analysis include the business's earning power, the sufficiency of the capital structure, economic conditions, managerial efficiency, and whether the same management will continue to operate the company. *In re Clarkson*, 767 F.2d 417, 420 (8th Cir. 1985). A Sixth Circuit Opinion has held the following factors, similar to those just described are relevant to such a finding: (1) the adequacy of the capital structure; (2) the earning power of the business; (3) economic conditions; (4) the ability of management; (5) the probability of the continuation of the same management; and (6) any other related matter that determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 589 (6th Cir. 1986).

Charter One insists that Debtors' Plan is not feasible because Debtors' projections are unreliable and do not support Debtors' ability to meet its obligations under the Plan. It also argues that Debtors will not be able to refinance their debt to Charter One as proposed in the Plan.

Charter One contends that Debtors' projections are not based on objective facts but rather on "sheer speculation" and must therefore be rejected (Charter One Proposed Conclusions of Law ¶ 108) Specifically, Charter One disputes Debtors' projection of an increase in gross revenue for years 2012 and 2013 because Debtors suffered declines in gross revenue for years 2008, 2009, and 2010. (*Id.* at ¶ 113) In addition, Charter One does not believe that Debtors can exceed preceding years profitability as measured by "Net Income Before Depreciation and Other Income (Expense) [sic]," which is Debtors' preferred method of measuring profitability. (*Id.* at ¶ 114) The creditor argues that Debtors' projections are not based on past performance but upon unfounded assumptions that do not correlate with Debtors' actual business history. (*Id.* at ¶ 112) Charter One questions Debtors' ability to generate sufficient cash flow from their operations to

pay Charter One and all other plan related obligations when they have failed to generate that level of cash either in 2010 or 2011. The projections are therefore said not to be reasonable or achievable.

According to Charter One, past performance should be examined to determine reliability of Debtors' projections. That principle is generally accepted. *See, e.g., F.H. Partners, LP v. Investment Co. of the Southwest, Inc. (In re Investment Co. of Southwest, Inc.)*, 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006) ("A glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the plan is not feasible."); *In re Am. Trailer & Storage, Inc.*, 419 B.R. 412 (W.D. Mo. 2009) (stating that to determine whether projections are reliable, a court should compare projections to a debtor's actual performance); *In Merrimack Valery Oil, Co.*, 32 B.R. 485 (Bankr. D. Mass. 1983) ("income projections indicating financial progress must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic predictions . . . .").

Yet a debtor's history is not the only factor to be considered. A Fifth Circuit Opinion has noted that "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible. *Matter of T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997). Debtors are not required to view business and economic prospects in the worst possible light. *Id.*

In this case, it is reasonable to believe that Debtors will be able to make payments required under their Plan because they have consistently made adequate protection payments throughout this case. The amount of those monthly payments, $39,938.00, while smaller than the total due under the Plan each month, were made during a period in which Debtors failed to achieve the level of profitability that Charter One believed necessary to afford those payments. As noted by Debtors' counsel, over twenty-five years of operations Debtors have met EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) standard only about 80% of the time. Despite this, Debtors managed to remain current on all of their obligations. (Tr. 466)

Additionally, Debtors presented sufficient evidence of their improved business prospects. For example, Debtors' new Chief Financial Officer Charles T. Bellows testified to a change in business strategy that has resulted in new contracts for Debtors. (Tr. 434) As a result of these changes Debtors have obtained new sources of income and profit. (*Id.*) Debtors' net income

decreased by $300,000 after loss of its School District 214 contract, but that income has been replaced by Debtors' new contract with 600 West. (Tr. 441; Debtors' Ex. 3) Debtors have also generated new business by leasing bus storage space to Chicago Classic Coach and Grand Prairie. (Tr. 445) Moreover, Debtors have reduced real estate taxes and salary expenses, thereby resulting in leaner operations. (Tr. 484–85) Finally, Debtors investigated the viability of price increases to their customers and found that a three percent price increase is possible in light of price increases of their competitors. (Tr. 37)

Charter One argues that since refinancing has not yet been made available to Debtors, it is not likely that any will be forthcoming within the next two and one-half years. However, the altered business prospects of Debtors lend support to their belief that such refinancing will be available when needed. And if it is not available, Charter One will be able to recover on its collateral.

**Good Faith is Demonstrated**

Charter One contends that the Debtors's Plan should not be confirmed because it was not submitted in good faith as required in 11 U.S.C. §1129(a)(3). Central to that argument are two pieces of property controlled by Debtors. The first is the farm located in Harvard, Illinois and used by Karen Bingham (the sole director of the Debtors) to board over one hundred of her horses. Prior to the petition date, the farm was not Charter One collateral. The second piece of property is located in Elk Grove Village, Illinois, which is used by D&B Rentals to maintain vehicles for their charter business. Karen Bingham and her son work on Elk Grove Village property, and also live on that property.

Control and use of those properties has been subject to intense debate between Debtors and Charter One. Debtors' Plan recognizes that the Harvard farm has been marketed appropriately and sold, all to reduce Charter One's claim by $500,000. The sale of the farm was earlier delayed because Bingham needed to relocate her horses, but that problem has passed.

In addition, Debtors have attempted to find a different location other than the Elk Grove Village property to store buses, but have not found anything suitable. (Tr. 77) Given the location of that property near O'Hare airport, however, it is a good location for property owned by a charter bus business, good for Debtors and good for other bus companies that need to rent parking space.

11

Charter One argues that refusal by Debtors to consider selling the Elk Grove Village property demonstrates a lack of good faith in the plan. It reasons that Debtors delay in selling the properties is motivated by Karen Bingham's desire to live on the property free of charge. Also, it argues that the original delay in the sale of the farm was for the sole benefit of Bingham to enable her to relocate her horses. Therefore, according to Charter One, the entire Plan of Reorganization is proposed for the benefit of Bingham, not Debtors' business entities. The issue thus posed is whether a plan is proposed in bad faith if it provides any personal benefit to the owner of the debtor corporation, even if the debtors can demonstrate a good business reason and prospects for their plan. Since Bingham has allowed the farm sale to close, her earlier delay to protect her horses is no longer serious. The Elk Grove Village property, while a home for Bingham, has a large area leased profitably to park vehicles of other companies, so there is a good business reason to retain that property,

There are many considerations involved in determining whether or not a plan is filed in good faith, and a bankruptcy judge is given wide discretion as to that requirements. A Seventh Circuit Opinion on the subject is instructive.

> The bankruptcy code requires that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The term "good faith" as used in this section is not defined by the Bankruptcy Code. *In re Madison Hotel Assocs.,* 749 F.2d 410, 424 (7th Cir.1984). " '[T]he term is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.' " *203 N. LaSalle St. P'ship,* 126 F.3d at 969 (*quoting Madison Hotel,* 749 F.2d at 424–25). In evaluating whether a plan has been proposed in good faith, the focus of the inquiry is the plan itself, which must be viewed based on the totality of the circumstances surrounding the development and proposal of that plan.

*Madison Hotel,* 749 F.2d at 425; *SM 104 Ltd.,* 160 B.R. at 244. In determining whether a plan will achieve results consistent with the objectives and purposes of the Bankruptcy Code, the following standard was used in a prior case before the undersigned judge:

> The key test of good faith in Chapter 11 is whether the Debtors has proposed or can propose a legally and economically feasible plan of reorganization. *See Marsch,* 36 F.3d at 828 ("The test is whether a Debtors is attempting to unreasonably deter and harass creditors *or attempting to effect a speedy, efficient reorganization on a feasible basis.*") (emphasis added). In other words, the question is whether the case and possible plan serve a valid reorganizational purpose. *SGL Carbon,* 200 F.3d at 165. If

12

not, then the case was filed only to harass and delay creditors, and therefore was filed in bad faith.

*In Matter of Strug-Div., LLC*, 375 B.R. 445, 449 (Bankr. N.D. Ill. 2007). A similar test was laid out in *203 N. LaSalle*. To be in good faith, a plan must have "a true purpose and fact-based hope of either 'preserving [a] going concern' or 'maximizing property available to satisfy creditors.'" *S. Beach Sec.*, 606 F.3d at 376 (*quoting Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999)).

The Debtors' Plan in this case meets the good faith requirement as it has been determined to be economically feasible and the Plan was submitted with a valid reorganization purpose, that is to continue business operations of Debtors' entities. The Plan has specific steps for reorganizing the business, the Debtors are strongly focused under new leadership on making the reorganization successful. Furthermore, the Plan contains financial benchmarks and serious ramifications if those benchmarks are not met. If Debtors fail to make even one monthly payment Charter One may foreclose on its liens against Debtors' property. Therefore, the Plan has not been put forward to harass or delay creditors, but rather is actually designed to accomplish successful reorganization of the business.

Charter One proposes a test for bad faith that states, "a plan which serves as a vehicle for the personal profit of the Debtor's owners at the expense of the Debtor's creditors is not proposed in good faith." *In re Rusty Jones, Inc.*, 110 B.R. 362, 375 (Bankr. N.D. Ill. 1990). However, that does not correctly characterize Debtors' Plan.

The case cited by Charter One in support of its position, *In re Rusty Jones*, involved a group of "investors" who purchased the debtor for $1.00 and then put it into bankruptcy. The investors then put forward a plan that gave themselves 20% of any net recovery, large future earnings, and a large amount of operating capital, while at the same time providing less than what was legally required for the unsecured creditors. *Id*. Charter One argues that Bingham is doing something similar because she is allowed to continue to live on the Elk Grove Village property and originally took time to sell the horse farm so that she could find adequate relocation for the horses. However, these actions are by no means comparable to actions of investors in *Rusty Jones*. Those investors were gaming the bankruptcy system, and they proposed a plan that was not consistent with the goals of a bankruptcy reorganization. In this case, there are valid reasons for Debtors to keep the Elk Grove Village property, and those reasons are independent of

Bingham living there. The Plan was not proposed for Bingham's "personal profit," but rather to reorganize the corporation in a way that deals with practical issues that Debtors face.

Debtors' Plan has been put forward in good faith. Broad discretion is left to bankruptcy judges to find bad faith or not. Since the Plan has been put forward with the goal of a genuine reorganization that compensates the creditors and the Plan is clear in its protections to Charter One and not inaccurate in its specifics, it has been filed in good faith. Charter One's attempt to characterize the Plan as a vehicle for the personal profit of Bingham does not comport with purposes of and motivations behind the Plan. Furthermore, the Plan provides complete payment to the objecting creditor, with numerous benchmarks that need to be met. Therefore, the Plan has not been proposed at the expense of the creditors and Charter One incurs little risk if this Plan is confirmed. As a result, it is found that the good faith requirement under § 1129(a)(3) has been met.

### Jurisdiction Lies Over Post-Confirmation Events

Charter One finally argues that Debtors' Plan cannot be confirmed because it requires the judge to retain jurisdiction over possible future events, a retention it argues is not authorized by statute. Debtors' Plan provides for potential sale of real and personal property to pay Charter One's Claim. In order to sell their assets after the effective date of the Plan, Debtors seek in their Plan the ability to obtain a future order from the bankruptcy judge authorizing them to sell assets free and clear of any interests therein and pay the proceeds to their secured creditors. (Plan ¶ 6.3) Debtors also seek the ability to file a motion with the bankruptcy judge to obtain authorization of any refinancing of Charter One's Claim. Charter One questions the authority of the bankruptcy judge to retain jurisdiction over the future sale of assets and any future refinancing of its Claim after the Plan has been confirmed.

It is strange that Charter One attacks the authority proposed to enable its protection through post-confirmation payment of debt due it. Nonetheless, it is proper to reserve jurisdiction to rule on those issues because they are core proceedings under 28 U.S.C. § 157. While authority of the court is limited post-confirmation, it can be retained to ensure that the reorganization plan is implemented.

28 U.S.C. § 157 provides:

Bankruptcy judges may hear and determine all cases under Title 11 and all core proceedings under Title 11... Core proceedings include, but are not limited to—(A) matters concerning the administration of the estate; ... (D)

orders in respect to obtaining credit... (N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate.

Refinancing and sale of assets would be considered core proceedings under parts (D) and (N) respectively, as well as potentially under (A). A future proceeding that requires the bankruptcy judge to approve refinancing or a sale would thus fall within the judge's authority under 28 U.S.C. § 157. Therefore, reservation of jurisdiction post-confirmation to rule on such issues is authorized by that provision.

Authority of a bankruptcy judge is indeed reduced following confirmation. *Pettibone Corporation v. Easley*, 935 F.2d 120, 122 (7th Cir.1991). However, it is recognized that authority may be retained to a limited extent post-confirmation to ensure that reorganization plans are implemented. *In re Spiers Graff Spiers*, 190 B.R. 1001, 1007 (Bankr. N.D. Ill. 1996) (citing *Goodman v. Phillip R. Curtis Ent.*, 809 F.2d 228, 232 (4th Cir.1987)); *Blair v. Finan (In re Elless Co.)*, 174 F.2d 925, 929 (6th Cir.1949); *Chase Manhattan Bank v. Sultan Corp. (In re Sultan Corp.)*, 81 B.R. 599, 602 (B.A.P. 9th Cir. 1987); *General Motors Acceptance Corp. v. Fortner Oilfield Serv., Inc. (In re Fortner Oilfield Serv., Inc.)*, 49 B.R. 9, 10 (Bankr. N.D. Tex. 1984); *In re Morgan & Morgan, Inc.*, 24 B.R. 518, 521 (Bankr. S.D.N.Y. 1982). Post-confirmation jurisdiction is clearly retained (1) where the debtor's plan provides for retention of jurisdiction and that retention is necessary for implementation of the plan, and (2) to clarify ambiguities in the plan. *See, e.g., Winston & Strawn v. Kelly (In re Churchfield Management & Inv. Corp.)*, 122 B.R. 76 (Bankr. N.D. Ill. 1990)

In this case, the plan provides for the future sale of assets (Plan ¶ 6.3) as well as future refinancing of the Charter One's allowed bank claim (Plan ¶ 4.4.1.2), and would expressly retain jurisdiction for the judge to approve if either of these events occur. In the event that the Debtors do need to refinance or sell assets, jurisdiction will be necessary for the Plan's implementation, and that authority can be reserved.

Charter One essentially argues that jurisdiction post-confirmation is not proper because the Plan does not show a currently proposed and specified sale of assets or a refinancing that is now available. It is true that no specific sale of assets is put forward, and that there is also no specific refinancing agreement presented for approval upon confirmation. However, the Plan does clearly provide for possible situations where a sale of assets and/or refinancing will occur.

Indeed, the Debtors propose a complete liquidation of its assets in a §363 sale if they are not able to pay off Charter One's Claim through refinancing within a designated period.

Sale of assets and refinancing are core proceedings as defined by 28 U.S.C. § 157, and therefore the bankruptcy judge does have and can retain jurisdiction over these possible situations. The possible future asset sale and refinancing are situations over which the Plan specifically retains jurisdiction, and if a sale or refinancing occurs, it will be in a situation where either or both will be necessary for successful implementation of the Plan.

Charter One's cramped view of the statute would negate any Plan that does not have a necessary transaction ready to proceed. However, that does not state the law, and so reservation of jurisdiction can and will be ordered here as part of the Plan.

## CONCLUSION

Debtors have met all requirements for confirmation of their Plan of Reorganization under 11 U.S.C. § 1129. Therefore, Plan confirmation will be approved after evidence is taken to fix the appropriate interest rate.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Entered this 22 day of March, 2012.